IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| WILLIAM HIGGINS, : | |
| : | |
| Plaintiff, : | |
| : | Civil Action No.: L-11-0081 |
| v. : | |
| : | |
| MARYLAND DEPARTMENT OF : | |
| AGRICULTURE, : | |
| : | |
| Defendant | |

o0o

## MEMORANDUM OPINION

This is an employment discrimination case brought by Plaintiff William Higgins ("Higgins") against the Maryland Department of Agriculture ("MDA"). Higgins, a long-term employee of the MDA, suffered from a mental illness that caused him to act inappropriately at work. Eventually, after Higgins's behavior worsened, the MDA terminated his employment. Higgins contends that the MDA (i) failed to provide him with a reasonable accommodation, and (ii) terminated him based on a disability. Pending is the MDA's Motion to Dismiss, or, in the Alternative, for Summary Judgment. Docket No. 21. Higgins has filed a response in opposition to which the MDA has replied. The matter is briefed and ready for disposition; no hearing is necessary. See Local Rule 105.6 (D. Md. 2011).

First, Higgins has failed to prove that he is a "qualified individual" who is entitled to relief under the applicable statutes. Second, Higgins's behavior had become so disruptive that it could no longer be tolerated. Thus, he was terminated for misconduct and not because of a

1

disability. For reasons to follow, the Motion to Dismiss will be GRANTED by separate Order of even date.

**I.      Background**

Higgins began serving as the director of the MDA's animal health laboratory in Centreville, Maryland (the "CAHL"), in December 1987. Higgins's most recent direct supervisor was Nancy Jo Chapman ("Chapman"), the assistant state veterinarian. Chapman, in turn, reported to Guy Hohenhaus ("Hohenhaus"), the state veterinarian. The CAHL director investigates public health and infectious disease problems affecting animals on farms in the Maryland Eastern Shore counties. The director is also responsible for promoting sound and compassionate animal health practices, overseeing the laboratory and its employees, interacting with veterinarians and farmers, and collaborating with various government agencies regarding veterinary services, public health, and bioterrorism issues. Higgins's job brought him in constant contact with other animal health professionals, government officials, and members of the public.

Between 1987 and 2005, Higgins received performance reviews ranging from "exceeds job performance standards" to "outstanding" and "superior." Am. Compl., Docket No. 13. Not all assessments of his performance during this time were positive, however. In 2002, Higgins's review stated that he was "abrasive and confrontational." In 2003, his review called him "abrasive and arrogant." In 2004, his review stated that he was "abrupt with [the] public, fellow staff, and subordinates." Id.

Near the end of 2005, these behaviors apparently began to escalate, leading to complaints by fellow employees. For example, in November, Hohenhaus received a complaint from an employee who had visited the CAHL to work on an incinerator. The employee alleged that he

2

had been verbally assaulted by Higgins, who was upset about not having received advance notice of the work. By 2006, MDA management began to receive regular complaints from the public, co-workers, and supervisors about Higgins's erratic behavior.

In early 2006, Higgins began experiencing symptoms of depression and mania. Around this same time, according to MDA management, Higgins exhibited "[i]nappropriate outbursts, comments or arguments in the workplace, public settings, meetings, or interactions with the public," and a "[f]ailure to follow established Agency policies, practices and procedure." Id. In February, Higgins attended a meeting with two members of the public and an employee of the state Department of Health and Mental Hygiene. At the meeting, he told the group that he had been beamed to Mars and had a chip in his brain that allowed him to see clearly. In March, Higgins was diagnosed with bipolar II disorder; he began taking medication and seeing specialists for treatment.

That autumn, Higgins was reprimanded for refusing to abide by new procedures for employee evaluation, failing to control the amount of overtime claimed by subordinates, and refusing to follow MDA procedures for authorizing overtime. On December 14th, during a regional veterinarians meeting with the MDA's homeland security expert, Higgins publicly confronted Hohenhaus to voice displeasure about leave and pay issues that were unrelated to the meeting. On December 20th, Higgins was admonished for his "unprofessional conduct" at the meeting and for being "rude and unprofessional" to the expert. Id.

Nevertheless, Higgins's misconduct continued in 2007. On March 28th, Higgins submitted to the MDA human resources department a note from his doctor stating that, for the previous year, Higgins had been treated for a condition that required regular office visits,

consultations with specialists, and adjustments to medication.  On July 6th, two members of the public visited the CAHL to have papers signed for an animal fair.  The two later reported to the MDA that, during this visit, Higgins had acted "crazy" and was "argumentative and nasty."  Both visitors warned that Higgins might attempt to harm himself or his supervisors.  Def.'s Mot., Docket No. 21, Ex. 7.  One visitor quoted Higgins as saying, in reference to Hohenhaus, "You mark my word—it will end one way or another, I promise you."  Id.  During a July 19th meeting, Higgins was "loud, combative, rude, and offensive," as noted in a subsequent "Formal Counseling" memorandum from Hohenhaus to Higgins.  Id.

   Higgins's behavioral problems did not abate the following year.  In March 2008, Higgins had a telephone conversation with an MDA attorney.  Higgins's demeanor during that conversation was later described in formal counseling as "unprofessional and offensive" and "loud, combative and rude."  Id.  In an April 1st meeting, Hohenhaus told Higgins that he needed to get "healthy" and threatened him with termination.  Id.  On August 6th, Higgins was investigated for "an ongoing pattern of offensive behavior" including "loud, rude language" directed at his secretary, superiors, and the public.  Id., Ex. 8.  He was suspended for five days.

   In 2009, Higgins's bad behavior escalated to an unsupportable level.  On February 10th, Higgins was designated the primary backup to a pathologist at the MDA Poultry Laboratory in Salisbury, Maryland (the "SAHL").  The SAHL is approximately 70 miles from the CAHL, a nearly three-hour round trip.  Higgins was required to make this commute only on days when the primary poultry pathologist was absent.  Nevertheless, Higgins objected to the length of the commute.  He also complained that poultry pathology was outside his area of expertise and, therefore, that he would not be effective in his new duties.  The assignment caused Higgins

considerable stress, and he voiced his displeasure to Hohenhaus, Chapman, and human resources. In May, Higgins was required to be on-site at the SAHL for eight days in a row.

On April 29th, Higgins had three meetings with MDA animal-health personnel. Participants later reported that, during one of the meetings, Higgins was "disruptive" and "ready to blow." Am. Compl., Docket No. 21. At another meeting, Higgins was allegedly "nonproductive" and employed "intimidating body language with a raised voice and finger pointing," which decreased the productivity of the meeting. Pl.'s Opp., Docket No. 26. Higgins informed the group that he had been "sick for the last three months" but was presently well. Id. Higgins said he was "going to take on everyone." Am. Compl., Ex. 9.

The next day, Hohenhaus directed Chapman to begin an investigation into Higgins's conduct at the meetings. On May 1st, Higgins, in a letter circulated to at least a dozen other MDA employees, accused Hohenhaus of being a liar, cheat, and thief, and suggested that he should be fired. Id., Ex. 10. Chapman concluded that Higgins should be referred to the agency's Employee Assistance Program to "address repeated behavior problems." Id. This referral was never made, though the record does not indicate why.

On May 6th, Chapman had a meeting with Higgins to discuss his conduct at the April 29th meetings. Higgins repeatedly interrupted her. On May 8th, Higgins allegedly told Chapman that he was considering suicide. Chapman wrote to the MDA's head of human resources that she was "concerned for Dr. Higgins' well-being" and that efforts to control his behavior were futile. Id. She advised that any future investigation should "minimize the risk of self-harm." Id. Assistant Secretary of Agriculture S. Patrick McMillan then placed Higgins on paid administrative leave, with specific instructions not to report to work. Nevertheless, Higgins

5

appeared at an agricultural fair the next day and assisted a fellow MDA employee. In conversation with the co-worker, Higgins said that he had been depressed for a decade.

The co-worker informed Chapman that Higgins had assisted at the fair and reported thoughts of suicide. The co-worker asked if Higgins was "off his medicine." Id. On May 10th, Chapman sent an e-mail to MDA management saying that she had consulted a hospital and was advised to refer Higgins to professional help or contact police. Chapman called Higgins's wife to inquire as to his mental health and express concern that he might be suicidal. Mrs. Higgins told Chapman that her husband was under a doctor's care. The next day, Chapman and the head of human resources contacted Higgins to inform him that he had been placed on leave because he was contemplating suicide. On May 14th, Higgins wrote to McMillan and denied that he was suicidal. The next day, Higgins told Chapman that she was a "goddamned liar and a slanderer." Id. On May 19th, McMillan, Chapman, and others met with Higgins at MDA headquarters. At the outset of the meeting, Higgins asked if anyone wanted water, adding, "It's not poisoned." Id. Higgins refused to answer questions about his conduct, citing his rights under the Fifth Amendment of the United States Constitution. The next day, McMillan met with Higgins and informed him that his employment had been terminated.

On June 4th, Higgins appealed his termination to the Secretary of the MDA. The appeal was denied. On June 25th, Higgins appealed to the Office of Personnel Services and Benefits within the state Department of Budget and Management. That appeal was also denied. Higgins then initiated proceedings before the Maryland Office of Administrative Hearings. He withdrew that appeal, however, to pursue claims before the federal Equal Employment Opportunity Commission ("EEOC"). The record does not include the results of the EEOC investigation.

Higgins filed suit on January 12, 2011. In an Amended Complaint, which he filed on April 27th, Higgins advances claims, under both § 504 of the federal Rehabilitation Act and the Maryland Fair Employment Practices Act, for failure to accommodate and disability-based discrimination.[1]

II.     **Standard of Review**

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Presley v. City of Charlottesville, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and

---

[1] 29 U.S.C. § 794 et seq.; MD. CODE ANN., STATE GOV'T §§ 20-606, 20-901, 20-1013. The acts of alleged discrimination are Higgins's ten-day suspension without pay and his termination.

conclusions." Id. (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

The Court may, under Rule 12(b)(6), and without converting the Motion to Dismiss into a Motion for Summary Judgment, consider exhibits insofar as they are "integral to and explicitly relied on in" the Complaint and to the extent that their authenticity is not challenged by the plaintiff. Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 234 (4th Cir. 2004) (internal citation removed); see also Tellabs, Inc. v. Makor Issues & Rights, LTD, 551 U.S. 308, 322 (2007) (court may consider "documents incorporated into the complaint by reference"). Further, to prevent a party from potentially misleading the court, documents referenced in the Complaint may be considered in their entirety on a Motion to Dismiss.[2] Id. at 324.

III. **Analysis**

    a. **Preliminary Considerations**

Higgins brings his claims under both the federal Rehabilitation Act and Maryland's Fair Employment Practices Act ("FEPA"). These statutes are not a model of clarity.[3] Three points

---

[2] Plaintiff argues that the Court may not consider exhibits submitted by the Defendant in the current Motion without converting it to a Motion for Summary Judgment. As shown above, this is not entirely correct. The Plaintiff has not challenged the authenticity of any of the Defendant's exhibits. There is also little doubt that the exhibits are integral to the Plaintiff's Complaint. Only some of the documents, however, were "explicitly" relied on in the Complaint. Accordingly, in analyzing the current Motion to Dismiss, the Court will only consider those documents referenced in the Complaint.

[3] The Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20), shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

warrant mentioning here. First, the statutes have been interpreted to mean the same thing, though there is apparently no definitive statement to this effect. The parties assume that the FEPA provides the same protections and requires the same elements of proof as does the Rehabilitation Act.[4] Accordingly, for the purpose of deciding the instant Motion, the Court will accept this assumption and apply its analysis equally to both statutes. See Ross v. Bd. of Educ. of Prince George's Cnty, 195 F. Supp. 2d 730, 734 n.1 (D. Md. 2002); but see Kohler v. Shenasky, 914 F. Supp. 1206, 1211 (D. Md. 1995) ("There is no indication that Maryland intended [FEPA to] provide the same extensive rights and protections as the [Rehabilitation Act]."). In addition, claims brought under the Rehabilitation Act are subject to the same analysis as claims brought under the Americans with Disabilities Act. Doe v. Univ. of Md. Medical Sys. Corp., 50 F.3d 1261, 1264 n.9 (4th Cir. 1995) (explaining that the same elements apply to Title II of the ADA and § 504 of the Rehabilitation Act).

---

   Federal financial assistance or under any program or activity conducted by any Executive agency
   or by the United States Postal Service.

29 U.S.C. § 794. The FEPA provides that:

   An employer may not: (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of: (i) the individual's … disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or … (2) limit, segregate, or classify its employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of: … (i) the individual's … disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or … (4) fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee.

MD. CODE ANN., STATE GOV'T § 20-606. These prohibitions also apply to state agencies. MD. CODE ANN., STATE GOV'T § 20-901.

[4] There is good reason for this assumption. For example, the FEPA's interpretive guidelines were modeled after the Rehabilitation Act, and interpretation of the Rehabilitation Act has guided subsequent interpretation of the FEPA. See Mass Transit Admin. v. Md. Comm'n on Human Relations, 515 A.2d 781, 787 (Md. Ct. Spec. App. 1986).

Second, the statutes generally prohibit discrimination against employees on the basis of a "disability" as that term is defined by the ADA. See Rhoads v. F.D.I.C., 257 F.3d 373, 387 (4th Cir. 2001). They also require an employer, upon request, to offer a "reasonable accommodation" to disabled employees who are "otherwise qualified" for the position.

Third, the statutes both require administrative exhaustion. See, e.g., Snead v. Bd. of Educ. of Prince George's Cty., No. DCK-11-0503, 2011 WL 3885811, at *2 (D. Md. Sept. 2, 2011) ("Prior to filing a law suit alleging violations of the ADA or the Rehabilitation Act, a plaintiff must first exhaust administrative remedies.").[5] The exhaustion requirement under the Rehabilitation Act is identical to that of Title VII. Id. at *2.

### b. Disability Discrimination and Failure to Accommodate

Higgins advances two separate claims. He contends that the MDA (i) failed to provide him with a reasonable accommodation, and (ii) terminated him on the basis of a disability. Although reasonable accommodation and discrimination claims are analyzed under two separate tests, both require Higgins to prove that he is a "qualified individual with a disability."[6]

---

[5] An exhaustion requirement also is required by the FEPA. MD. CODE ANN., STATE GOV'T § 20-1013(a)(1); Crosten v. Kamauf, 932 F. Supp. 676, 679 (D. Md. 1996). Under the FEPA, a plaintiff may bring suit if a timely state, federal, or local administrative charge was filed; at least 180 days has passed since the filing of that charge; and the action is within two years of the allegedly unlawful conduct. Id. The timely charge of discrimination must state "the particulars of the alleged discriminatory act." MD. CODE ANN., STATE GOV'T § 20-1004(b)(2)(ii).

[6] To establish a prima facie case for failure to accommodate, Higgins must show (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of his position; and (4) that the employer refused to make such accommodation. Rhoads, 257 F.3d at 387 n.11.

To establish a prima facie case for disability discrimination, Higgins must demonstrate that he (1) is disabled; (2) is otherwise qualified for the position; and (3) suffered an adverse employment action solely on the basis of his disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005).

A plaintiff is "qualified" if he or she is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). They do not include "the marginal functions of the position." Id. The "essential functions" of Higgins's position included courteous and professional interactions with the public, fellow staff, subordinates, and supervisors. He was also required to follow MDA policies, practices, and procedures.

Higgins argues that his behavior throughout his long employment at the MDA was consistent, and that his colleagues and superiors respected his job performance and "accepted that his personality was different." Pl.'s Opp. 43–44. Although one of Higgins's claims relates to the MDA's failure to provide a reasonable accommodation, he also appears to argue that he did not need an accommodation in order to perform the essential functions of his job: "he was able to meet the requirements of his position throughout his employment with MDA… he was able to perform the essential functions and was even given a raise immediately prior to his termination." Id. at 43. Higgins's contention, in other words, is that an ability to behave professionally and courteously was not "essential" to his position. See, e.g., id. at 8 (arguing that Higgins's "behavioral foibles and mental condition did not compromise his ability to successfully perform the duties of his position"). This is simply incorrect.

Higgins cannot and does not deny his long history of outbursts and improprieties at work. He consistently failed to treat co-workers and members of the public with respect. For instance, Higgins referred to the MDA Director, Hohenhaus, as "buddy boy," and sent him an emotional letter stating "unlike you, Dr. Hohenhaus, I do not lie, cheat, or steal!" Id. at 11, 22. Similarly,

11

he accused Chapman of being "a God damned liar and slanderer." Id. at 30. Two women who came to Higgins's lab were so upset by his behavior that they complained to the MDA. In 2008, he was put on a five-day suspension when his own secretary complained about his ongoing pattern of using offensive language.

Moreover, Higgins concedes that he was unable to control his behavior: "Dr. Hohenhaus was again, targeting Dr. Higgins' behavior, which, given Dr. Higgins' mental well being, was not something Dr. Higgins could simply control." Id. at 14. The above instances, along with others that are documented in the record, prove that Higgins was consistently unable to interact with other individuals in a respectful and appropriate way. Because he could not, therefore, perform the "essential functions" of his position, he is not a "qualified" individual entitled to relief under the applicable statutes. See Darcangelo v. Verizon Maryland, Inc., 189 Fed. Appx. 217, 218–19 (4th Cir. 2006) (concluding that an employee who suffered from bipolar disorder was not "otherwise qualified" because her "aggressive and antagonistic behavior thus demonstrated her complete inability to interact with others in a courteous manner, as required by her position and Verizon's Code of Business Conduct").

In sum, Higgins failed to do his job because of his bad behavior. Moreover, the fact that the bad behavior was caused by a mental disorder does not excuse Higgins's failure to perform the essential functions of his position. A plaintiff must establish that he could have satisfied the requirements of his job with a reasonable accommodation, but that the employer failed to provide one upon request. See note 6, supra; see also Fleetwood v. Harford Systems, Inc., 380 F. Supp. 2d 688, 701 (D. Md. 2005) ("The employee bears the initial burden of informing his employer that an accommodation is needed."). Higgins cannot satisfy either of these two

points. To this day, he has not identified an accommodation that would have enabled him to conform his behavior to an acceptable standard. Further, he never approached the MDA to disclose the details of his impairment and initiate a dialogue by requesting an accommodation that might overcome the obstacle posed by it.

In providing a reasonable accommodation, employers are not required "to reallocate essential job functions or assign an employee 'permanent light duty'" Crabhill v. Charlotte Mecklenburg Bd. Of Educ., 423 Fed. Appx. 314, 323 (4th Cir. 2011).[7] Similarly, employers are not required to tolerate abusive behavior by a disabled individual, even if the behavior is related to the disability. See Darcangelo, 189 Fed. Appx. at 219. Indeed, "[t]he law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." Jones v. Am. Postal Workers Union Nat'l, 192 F.3d 417, 429 (4th Cir. 1999) (internal citations omitted).

In sum, given Higgins's extreme misconduct, and absent evidence that a reasonable accommodation would have resulted in cessation of that misconduct, Higgins is not a "qualified individual" for the purposes of the Rehabilitation Act or FEPA. His disability discrimination and reasonable accommodation claims, therefore, must fail.[8]

---

[7] Similarly, employers may change an employee's responsibilities or adopt new management policies so long as the changes or policies are legitimate and not motivated by discrimination. Dr. Hohenhaus was, therefore, entitled to increase Dr. Higgins's job responsibilities, as he did in both 2006 and 2009. See Pl.'s Opp. 4, 18. He was also entitled to "recalibrate evaluations of laboratory employees." Id. at. 9. Senior management acted well within its rights when it dictated that the MDA "reduce or eliminate unbudgeted overtime." Id. at 10.

[8] The MDA also argues that Higgins has failed to exhaust his administrative remedies regarding reasonable accommodation. Given that Higgins's claim of denial of a reasonable accommodation fails on the merits, the Court need not decide this issue.

## IV. Conclusion

For the foregoing reasons, the Court will, by separate order of even date, GRANT the Defendant's Motion to Dismiss.

It is so ORDERED this 28th day of February, 2012.

                                                /s/
                                      Benson Everett Legg
                                      United States District Judge